## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **LAFAYETTE HARPER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 19-CV-2227** |
| | ) | |
| **MICHAEL BRANSFORD, BRUCE STARK,** | ) | |
| **JOSH CAMPBELL, PAT ALBLINGER,** | ) | |
| **UNKNOWN DANVILLE POLICE** | ) | |
| **OFFICERS, and CITY OF DANVILLE,** | ) | |
| **ILLINOIS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Plaintiff, Lafayette Harper, filed an Amended Complaint (#39) against

Defendants Michael Bransford, Bruce Stark, Josh Campbell, Pat Alblinger, Unknown

Danville Police Officers, and the City of Danville on April 22, 2020, alleging federal civil

rights violations under the U.S. Constitution pursuant to 42 U.S.C. § 1983 and Illinois

state law claims of malicious prosecution, intentional infliction of emotional distress,

and conspiracy.  Defendant Pat Alblinger filed his Motion for Summary Judgment (#49)

on July 1, 2021, and the remaining Defendants filed their own Motion for Summary

Judgment (#57) on July 16, 2021.  Plaintiff filed his consolidated Response (#61) to both

motions on September 30, 2021.  Defendant Alblinger filed his Reply (#63) on October

28, 2021, and the remaining Defendants filed their Reply (#65) on November 9, 2021.

BACKGROUND

This case arises out of the murder of Tim Shutes during an attempted robbery as Shutes attempted to purchase marijuana on October 24, 2009, in Danville, Illinois. During the attempted marijuana purchase, an assailant armed with a shotgun opened the back seat door of the vehicle in which Shutes was sitting and attempted to rob Shutes and his compatriots. Shutes struggled with the assailant, the gun went off, and Shutes was killed instantly. Plaintiff was eventually arrested and charged with Shutes' murder in November 2010, and convicted of the murder following a jury trial in 2014. However, the Illinois Appellate Court vacated Plaintiff's conviction due to the improper admission of certain evidence at the trial and remanded the matter for a retrial. See *People v. Harper*, 80 N.E.3d 856 (Ill. App. Ct. 2017). Plaintiff was acquitted of Shutes' murder at the January 2019 retrial.

Plaintiff has now filed a federal civil rights lawsuit against Defendants.

In Count I, Plaintiff alleges that the law enforcement officer Defendants violated his right to due process by fabricating evidence from several witnesses against Plaintiff in order to justify his arrest and prosecution.

In Count II, Plaintiff alleges Defendant officers failed to disclose exculpatory and impeachment evidence to prosecutors, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), which, if disclosed, would have caused prosecutors to not bring charges against Plaintiff.

Count III alleges that Plaintiff was deprived of his liberty without probable cause before trial through Defendant officers' fabrication of evidence and withholding of exculpatory/impeachment evidence, in violation of the Fourth Amendment to the U.S. Constitution.

Count IV alleges a failure to train claim against Defendant City of Danville, pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

Counts V and VI allege Illinois state law malicious prosecution and intentional infliction of emotional distress claims, respectively, against Defendant officers.

Count VII alleges both federal and state conspiracy charges against Defendant officers.

Counts VIII and IX allege respondeat superior and indemnification claims, respectively, against the City of Danville.

*Factual Background*

The following background facts are taken from Defendants' Undisputed Statement of Material Facts, Plaintiff's Additional Facts section in his Response, and the exhibits attached by the parties to their filings.[1]

---

[1]Many of Plaintiff's disputations of Defendants' Undisputed Material Facts are prefaced with a blanket, boilerplate statement that the proffered fact is not "a full or accurate recitation of the facts in the light most favorable to the non-moving party." The court agrees with Defendants that general denials such as this are insufficient to rebut a movant's factual allegations. See *Boyd v. City of Chicago*, 225 F.Supp.3d 708, 714 (N.D. Ill. 2016). Plaintiff must cite specific evidentiary materials justifying his denial of the proffered fact. *Boyd*, 225 F.Supp.3d at 714. The court will not consider facts that are not supported by the record, or misstate the record. *Boyd*, 225 F.Supp.3d at 715.

The Parties and Personalities Involved In This Case

Defendants Michael Bransford, Bruce Stark, and Josh Campbell were, at all relevant times, police officers employed by Defendant City of Danville, a municipal corporation, with the Danville Police Department ("DPD") and acting within the scope of their employment.

Defendant Pat Alblinger has been employed as a Vermilion County Deputy Sheriff since 1993. Alblinger has been assigned as a narcotics investigator to the Vermilion Metropolitan Enforcement Group ("VMEG") since 2005, and at all relevant times was acting within the scope of his employment.

Plaintiff is a resident of Danville, Illinois. In 2003, he was arrested with his cousin, Davieon Harper ("Davieon"), during an armed robbery of a currency exchange. Davieon was the driver, and Plaintiff entered with another individual, DeAngelo Harris, who was holding a sawed-off shotgun. A fourth person, Jamar Hooser, provided a safehouse. Plaintiff received a ten-year prison sentence for armed robbery, was released in 2008, and was on parole in 2009 when the Shutes murder occurred.

Davieon is Plaintiff's cousin, and a Danville resident. Plaintiff has known Davieon his whole life. Davieon also served prison time with Plaintiff at Menard Correctional Center.

Donterrance Harper is a Danville resident, and is Plaintiff's cousin and Davieon's brother.

Tim Shutes, now deceased, is a former Danville resident who was shot and killed while attempting to purchase marijuana in Danville on October 24, 2009.

4

Randall Smalley is a Danville resident, and worked as a confidential informant for Alblinger in approximately five to ten controlled drug purchases between 2007 and 2009. Smalley and Shutes became best friends after Shutes and Smalley's sister, Ieca Smalley, began dating. Randall Smalley met Donterrance Harper while in jail on a traffic violation about three months before the Shutes murder.

Logan Vance is a 30-year old Danville resident who works as a barber and who was best friends with Plaintiff.

<u>The Murder of Tim Shutes on October 24, 2009</u>

At some point in October 2009, Tim Shutes wanted to purchase marijuana to sell, and asked Randall Smalley for help in finding a supplier. Previously, Donterrace Harper told Smalley that he and Davieon Harper could supply marijuana. Therefore, Smalley contacted Donterrace and arranged a purchase for 7:30 pm on October 24, 2009.

Instead of meeting Donterrace, however, Smalley was to meet with Davieon, who also went by the alias "Buster." Shutes drove Smalley, along with Ieca Smalley, to the meeting point. At the meeting point, Shutes pulled a blue Crown Victoria next to Davieon's purple Buick. Ieca Smalley could see Davieon in the Buick. Shutes parked the Victoria in the driveway, whereupon Shutes and Smalley exited the Victoria, leaving Ieca behind. Shutes and Smalley got into Davieon's car, and the three of them drove to Elmwood Park in Danville.

As they drove, Davieon made a phone call. Smalley was in the front passenger seat, and Shutes was in the rear passenger-side seat. On October 24, 2009, Plaintiff's cell phone number was (217) 474-3731, and Davieon's number was (217) 712-0758. As

5

confirmed by cell phone records, Davieon called Plaintiff at 7:18 pm, and they spoke for 68 seconds, then Plaintiff called Davieon at 7:25 pm, but they did not speak.  Davieon then called Plaintiff at 7:27 pm and again at 7:54 pm, but they did not speak.  Plaintiff does not recall these conversations, or if he and Davieon even talked with each other at those times.

After the 7:18 pm phone call, and shortly after they arrived at Elmwood Park, Smalley saw a person approach on foot and open the back driver's side door of Davieon's vehicle.  Smalley, in his deposition for this case, testified that the person was wearing a hoodie that was "pulled tight," and that all he could see was "the sideburns on the bottom half of the face."  When asked if he could see anything else, Smalley reiterated "[a]ll I seen was the bottom half of the face."

Davieon then pulled out a pistol, grabbed Smalley, and told him "If you move, you're dead too."  The person who opened the door was armed with a shotgun, demanded money from Shutes, struggled with Shutes, and ultimately shot Shutes in the head.  Davieon and Smalley both ran from the car when the shotgun fired.  After his initial flight, Davieon returned to his car and drove Shutes to the hospital.

Smalley ran to the house across the street at 326 Elmwood Street, where he made a call to 911 to report the shooting death of Shutes.  While Smalley was speaking to 911, Davieon drove by and indicated he was taking Shutes to the hospital.

At 7:26 pm, Danville police were advised via radio that someone had been shot at Elmwood Park and that the victim was being transported to Provena Logan Campus Hospital.  At 7:35 pm, Davieon arrived at Provena with Shutes, where Shutes was pronounced dead due to a gunshot to his head.

After calling 911, Smalley went back to Ieca's car, dropped her off at the hospital, and then went to his mother's house so he could contact Shutes' family about what had happened.  At his mother's house, Smalley contacted Defendant Alblinger, because he was unsure of what to do, and because he had worked with Alblinger previously and thought he could trust him.[2]  Alblinger told Smalley to talk to the Danville police. Alblinger did not record this conversation, took no notes about it, and otherwise made no documentation about the phone call at all.  After the phone call with Alblinger, but prior to being picked up by Alblinger, Smalley talked to an unknown DPD officer at Elmwood Park.  He never told this officer any details about the shooter.

DPD Investigation: October 2009 through May 2010

Danville officers Bransford, Campbell, and Stark were assigned as detectives to investigate the murder of Shutes.  At the hospital, Danville patrol officer Bostwick advised Davieon that since Davieon witnessed the shooting, he would need to be transported to the Danville Public Safety Building (DPD's police station) for questioning

---

[2]Attached as Exhibit 9 to Plaintiff's Response (#61) is a transcript of Smalley testifying at a hearing or trial in the state court proceedings.  While being cross-examined by defense counsel, Smalley affirms that he had done work for the police before, and he knew Alblinger was a police officer.  Smalley is then asked "And in fact, you had a burglary charge, and it was a 2006 case that was reduced because you provided information to the police, correct?"  Smalley answers "yes."  Smalley is then asked "That's why you called Pat Alblinger on the 24th?"  Smalley answers "yes."

by detectives.  Initially, Davieon described an intended "weed" purchase, stating he drove two individuals over to Elmwood Park, as that was the meeting place.  Davieon said that when he parked the car there, the outside passenger door was opened by a black male holding a shotgun.  Davieon stated that the black male, who he did not identify, leaned inside the rear door and said "give it up."

Sometime after they spoke on the phone, Alblinger picked Smalley up on the evening of October 24, 2009, and took him to the DPD.  Alblinger did not discuss the murder with Smalley en route.

Defendant DPD Detective Stark and Alblinger interviewed Smalley at 9:15 pm on October 24, 2009, at the Danville police station.  Alblinger sat in on the interview because he believed that Smalley would be more likely to "feel comfortable and open up."  Stark wrote a report with Alblinger to memorialize the interview.  Stark had worked with Alblinger on several cases before in prior years.  Alblinger does not recall assisting Stark in writing the report.

Smalley told Stark and Alblinger about speaking with Donterrace Harper and arranging to meet Davieon to purchase five pounds of marijuana for $3,500.  The officers learned that Smalley communicated with Donterrace via MySpace, arranged the proposed marijuana purchase, and then, on October 24, 2009, drove with Ieca Smalley and Shutes in Shutes' car to meet Davieon.  The officers also learned the positioning of the car's occupants: Smalley said he got into the front passenger seat of Davieon's car, Shutes got into the rear passenger seat, and they took side streets to the meeting point at Elmwood Park.  Smalley told the officers that Davieon was texting with someone

8

during the drive to Elmwood Park and immediately before they pulled into the parking lot. He said he suspected Davieon must have been using his phone to communicate with an accomplice. Smalley told the officers that he believed they were "set up" by Davieon and the shooter.

Smalley gave Stark a physical description of the shooter, and was shown a photo lineup, but was not able to make an identification. Though Davieon had not identified the shooter, Smalley described him as a black male who approached on foot, opened the back door, pointed a shotgun at Shutes, and demanded money. Smalley said Davieon put him (Smalley) in a headlock as this occurred and told him not to move. When the shotgun went off, Smalley said he escaped Davieon's grasp and ran one direction while Davieon and the hooded male ran together a different direction to a yellow building. Smalley was able to identify Davieon as the driver of the vehicle and the person who grabbed him. After the October 24, 2009, interview, Alblinger dropped Smalley off and they again did not discuss the murder en route.

On October 26, 2009, Stark interviewed Smalley again and Smalley identified Donterrace Harper as the person setting up the marijuana purchase. At this interview, Smalley was shown a photo array that included a picture of Plaintiff. Smalley could not identify anyone from the photo array as the shooter. Smalley took a polygraph examination to determine that he was not involved in setting up the murder and robbery. He passed the polygraph examination.

Based on the information they learned from Smalley, the Danville officers sought and obtained Davieon's cell phone records. A review of those records confirmed that Davieon communicated with Plaintiff immediately before the shooting, consistent with Smalley's statement that Davieon was texting with someone just prior to the assailant opening the rear door. Based on those communications immediately prior to the shooting, Campbell interviewed Plaintiff in an interview room at the police station equipped with recording capacity. However, the middle of the interview was not recorded because, according to Campbell, the audio was inadvertently turned off. Plaintiff, however, maintains that the audio was intentionally turned off.

Plaintiff was not arrested at this time, but the Danville officers continued their investigation regarding Shutes' murder, including submitting fingerprints found on Davieon's car to the Illinois State Police ("ISP") crime laboratory for testing. On February 16, 2010, the ISP lab report with the results of the fingerprint analysis was submitted to the DPD. The report indicated that Plaintiff's fingerprints were found in the location of the rear door where Shutes' was shot.

Alblinger did not have any role in the investigation of Shutes' murder after October 24, 2009, and before May 24, 2010. Although he was physically present at the October 26, 2009, and November 2, 2009, meetings with Smalley, Alblinger did not participate in those meetings/interviews. Alblinger was not present with Stark and Bransford when they interviewed Smalley again on October 27, 2009. He was not present when Danville officers interviewed Davieon, or when they interviewed Plaintiff. Alblinger had nothing to do with anything involving the physical evidence in

10

this case, or in interviewing other witnesses, because the investigation was outside his and his agency's jurisdiction.

DPD Investigation: May 2010 through November 2010

Initially, Smalley was unable to identify the shooter. Then, according to Smalley in his deposition, several months after the shooting, in May 2010, Smalley received a text from his former neighbor, Delonna Harper, a cousin of Plaintiff. She texted Smalley notifying him that Plaintiff was the person who shot and killed Shutes. However, earlier in his deposition, Smalley had testified that he did not remember exactly how he had heard Plaintiff's name, and that maybe he had heard it from his mother. He later clarified that it came from Delonna Harper.

In any event, based on that information, Smalley accessed the Illinois Department of Corrections ("IDOC") website and searched the name "Lafayette Harper" through its public portal and was able to view a photograph matching the name entered. Upon viewing that photograph of Plaintiff, Smalley recognized him as the individual that shot and killed Shutes. Smalley testified in his deposition in this case that, prior to May 24, 2010, he had never heard the name "Lafayette Harper" and did not know Plaintiff. Plaintiff is not aware of any grudge held by Smalley against him, or of any other reason why Smalley would testify falsely against him.

Smalley immediately notified police that he knew who the shooter was and went to the Danville police station on May 24, 2010, to give a formal statement. Bransford and Stark interviewed Smalley, while Alblinger sat in on the interview, as he had at the October 24, 2009, interview.

11

In this tape-recorded interview, Smalley recounted the communication from Delonna Harper and the check of the IDOC website.  He told the officers that he learned Plaintiff's name from Delonna Harper's text message and showed them the steps that he went through to view Plaintiff's photograph on IDOC's website.  Then he gave his statement identifying Plaintiff as the shooter of Shutes.  Smalley initialed and dated a photograph of Plaintiff to indicate he was identifying him as Shutes' shooter.  He also told police that the only time he had ever seen Plaintiff was at Elmwood Park on the day of Shutes' murder.

At the interview, Alblinger asked Smalley three questions about whether Smalley had been threatened to make any statements on behalf of the investigation, and whether anyone outside the police had approached him and asked or threatened him to make an identification of Plaintiff.  Smalley answered "no sir."

On November 10, 2010, Robert Cunningham, a cousin of Logan Vance, spoke with Danville police and informed them that he provided multiple shotgun shells to Vance about a month before the Shutes murder and that he believed the shells could have been used in the Shutes murder.  Cunningham had this concern because Vance had told him that Plaintiff boasted about robbing others.  Plaintiff denies discussing criminal activity with Vance.

On November 22, 2010, Bransford and Campbell interviewed Vance, who told police about meeting Plaintiff at Concept College of Cosmetology in September 2009, when they began attending school together.  Vance said he and Plaintiff became friends because they were the only males attending the school.  Further, Vance stated Plaintiff

told him that he obtained money by "hitting licks," which meant robbing people. Further, Vance said Plaintiff told him about a previous conviction for armed robbery and that he had a shotgun, but did not have any shells for it.  Vance said Plaintiff wanted to know if he could acquire shotgun shells for him.  Vance told Plaintiff that he believed Cunningham might have some shells.  Plaintiff denies this conversation ever took place.

Vance obtained shotgun shells from Cunningham in late September or early October 2009.  Vance stated that he gave the shells to Plaintiff within days of getting them from Cunningham and was certain he gave Plaintiff the shells prior to Vance's birthday on October 24, the same day as the Shutes murder.  Vance confirmed at his deposition that he gave the shotgun shells to Plaintiff in the parking lot of a Steak 'n Shake in Danville.  Vance stated that Davieon was with Plaintiff when Vance gave Plaintiff the shotgun shells.  Vance testified at his deposition that he was not threatened by anyone to make the statements regarding Plaintiff.

Plaintiff was arrested by Danville police on a warrant for the murder of Shutes in November 2010.

Criminal Trials Resulting From Shutes' Murder

Plaintiff was held at the Vermilion County Jail before his initial trial in 2014. Plaintiff was tried before a jury for the murder of Shutes in October 2014.

Smalley directly identified Plaintiff as the shooter at this trial, and was subjected to cross-examination by Plaintiff's defense counsel.  Smalley testified at this first trial that there was no lighting in Elmwood Park and it was "kind of dark" so he did not

"really get to see," and there was no dome light in Davieon's car.  During his testimony, Smalley stated multiple times that he could not see the shooter's face, but he did testify that he could see the bottom half of the shooter's face.  Also at the trial Smalley estimated the shooter's height to be six feet tall, wearing a black jacket with a black hoodie with the hood up, even though he had told Stark on the evening of the murder that the shooter was wearing a tan jacket and stood 6'4" or 6'5".  Plaintiff is 5'6".  Vance directly testified that he gave Plaintiff shotgun shells, and was cross-examined on the matter.  Plaintiff was convicted of Shutes' murder.

On July 13, 2017, the Illinois Appellate Court overturned Plaintiff's murder conviction based on the admission of certain text messages which the appellate court determined to be inadmissible hearsay and prejudicial, but remanded for a new trial because the evidence presented at trial was sufficient for a rational trier of fact to find Plaintiff guilty beyond a reasonable doubt.  Plaintiff was tried a second time in January 2019 for Shutes' murder and was found not guilty.

Smalley testified at both of Plaintiff's trials and in both trials identified Plaintiff as the person who shot Shutes, and was cross-examined at both trials about his inability to identify Plaintiff as the shooter when first interviewed by police, and the fact that he did not so identify Plaintiff as the shooter until May 24, 2010.

Vance testified at both trials that he obtained shotgun shells on Plaintiff's behalf.

Davieon was convicted of felony murder in the death of Shutes in September 2010 and given a 30-year sentence in the IDOC.  Davieon, who was with Plaintiff during the prior armed robbery involving a shotgun in 2003, did not testify at Plaintiff's first

trial, but did testify against him at his second trial. Davieon testified that Plaintiff admitted shooting Shutes, but said it was an accident. Davieon has no recollection of negotiating a subsequent plea deal for his testimony (including no recollection that Defendant officers were involved). Police never told Davieon that they wanted him to identify Plaintiff as the shooter. Davieon testified in exchange for receiving a lower sentence on his felony murder conviction.

Alblinger did not testify at or attend either of Plaintiff's murder trials.

<u>Plaintiff's Evidence of Fabrication and Conspiracy</u>

Plaintiff testified that he had nothing to do with the shooting of Shutes and is innocent of the associated crimes for which he was charged.

Jennifer Aper, a forensic scientist with the Illinois State Police, conducted forensic testing on a revolver, fingernail clippings of Shutes, and the shotgun used to kill Shutes, collected near the scene of the crime during the investigation into Shutes' murder, to determine if traces of DNA were present and to identify the source of the DNA.

Defendants (except for Alblinger) collected buccal swabs, which are swabs from the inside of the mouth, from Plaintiff, which Aper used as a comparison to evidence collected during the Shutes murder investigation. Aper scientifically determined that Plaintiff was not the source of the DNA on the shotgun used to kill Shutes. Aper also determined that Plaintiff was not the source of DNA found under the fingernails of Shutes, nor on the revolver. Aper testified that Plaintiff's DNA was not found on the murder weapon. DNA from "one male" was recovered from the murder weapon, possibly from Shutes, and unidentified female DNA was found on the murder weapon.

Brian Long, an ISP forensic scientist, conducted an examination of the shotgun used to kill Shutes and determined that "no latent prints" were discovered on the weapon.

Mitchell Oaties, Jr., is a Danville resident who resides at 107 Elmwood Avenue, Danville, just down the street from Elmwood Park. Danville police attempted to speak with Oaties Jr. on October 24, 2009, but he was not willing to provide any information other than what his father, Mitchell Oaties, Sr., had already told police: that a black male allegedly hid in the brush outside their home and then ran off when confronted.

Shawna Miller, a friend of Ieca Smalley, was interviewed by Danville police in connection with the Shutes murder on November 11, 2009. Miller told officers "that Randall Smalley told her that Mitchell Oaties [Jr.] did the shooting."[3] Several days after the Shutes murder, Miller and her fiancé and a friend drove to Elmwood Park "to see

---

[3]Defendants argue that Miller's statements concerning what Smalley told her and the Yahoo Messenger interaction are hearsay. The Smalley and Yahoo Messenger statements from Miller will not be considered for the truth of the matter asserted. However, their evidentiary source is a DPD police report dated November 1, 2009. Police reports are "admissible under the business records exception to the hearsay rule if: (1) 'the record was made at or near the time by—or from information transmitted by—someone with knowledge'; (2) 'the record was kept in the ordinary course of a regularly conducted activity of a business, organization, occupation, or calling'; (3) 'making the record was a regular practice of that activity'; (4) 'all these conditions are shown by the testimony of a custodian or another qualified witness'; and (5) 'the opponent does not show that the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness.'" *Minett v. Overwachter*, 433 F.Supp.3d 1084, 1087 (W.D. Wis. 2020), quoting Fed. R. Evid. 803(6). Further, third party witness statements summarized in a police report that are offered to show what information had been provided to a defendant officer and the effect that this information had on him are admissible. *Minett*, 433 F.Supp.3d at 1088, citing *Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019). The court will consider them in that context.

where it happened."  Miller told officers that Oaties Jr. may have seen her in the area, was familiar with the make and model of her car, and knew her maiden name, so that he could locate her on Yahoo Messenger.  Miller showed officers threatening messages she received via Yahoo Messenger which referenced her license plate and her visit to Elmwood Park.  The messages also threatened Miller for "putting yo nose in the wrong biz" regarding her interest in the Shutes murder.  Miller "had a feeling" that Oaties Jr. may have sent her the messages.

During his November 10, 2020, deposition in this case, Davieon Harper was asked if he shot Shutes, and replied "I don't know.  It's my recollection I didn't, but I can't say that I did, did not, or did."

Smalley testified at his deposition that no Danville police officer nor Alblinger ever pressured him to identify Plaintiff as the shooter.  Plaintiff testified that he has no personal knowledge that Alblinger ever did anything improper during any interview of Randall Smalley.

Plaintiff is unsure what individual Defendant officers did to violate his constitutional rights and has no knowledge of the City's police department practices, policies, and customs.  Plaintiff also has no specific knowledge of individual officers conspiring to accuse him of criminal activity.  He knows what impeachment evidence is, but is unsure what impeachment evidence was withheld at his trials.  He is not sure what exculpatory evidence was not produced at his trials.  Plaintiff does not know what specific evidence was fabricated.  He believes it was misleading that only one part of Davieon's car was tested for fingerprints, but he acknowledges that his fingerprints

would likely be on the vehicle because he helped Davieon with groceries the same day.

Plaintiff testified that he has never spoken to Logan Vance regarding shotguns, and never received any kind of ammunition from him.  Plaintiff testified that he has never owned or possessed a shotgun, including on the night of October 24, 2009, although he did participate in a 2003 armed robbery in which a shotgun was used. Plaintiff does not know of any promises made to Vance for his testimony and does not know any specific coercive tactics or threats, but says Vance stated in a text message, in relevant part, that: "I was forced to testify, but did everything I could to get out of it!" Vance recalls sending that text message and says what he meant was that he was subpoenaed.  Vance was never told that he had to testify or would face charges himself regarding the Shutes murder.  Vance testified at two separate trials of Plaintiff and did his best to answer truthfully on each occasion.

Danville resident Bobby Cunningham testified at Plaintiff's murder trials about having provided shotgun shells to Vance.  Plaintiff believes that Cunningham was not truthful in his trial testimony about giving Vance shotgun shells, but he has no personal knowledge to support his belief.

Concerning Alblinger's involvement in Plaintiff's case, Vance, Cunningham, and Davieon Harper all testified that they had never met Alblinger or spoken with him, let alone spoken with him about anything involving the murder of Tim Shutes.  Alblinger also had nothing to do with the plea deal struck by Davieon wherein he agreed to testify at Plaintiff's second trial in return for a reduced sentence.

18

<u>Davieon's Vehicle</u>[4]

In December 2010, Plaintiff filed a discovery motion asking the State to disclose and produce "All books, papers, documents, photographs or tangible objects, including but not limited to any audio, video, digital or electronic recordings, which the prosecuting attorney intends to use in the hearing or trial."

Prior to Plaintiff's first criminal trial, Plaintiff, on January 8, 2013, filed a motion to bar the prosecution from using fingerprint evidence it obtained from Davieon's car, the vehicle where the shooting occurred, because the State had not preserved the vehicle.  The Illinois State Police crime lab identified some of the fingerprints lifted from the back passenger door of the vehicle as belonging to Plaintiff. After DPD processed the vehicle as part of their investigation, the car was towed to a recycling facility.  The car was later crushed for scrap in October 2011, about two years after the murder and almost one year following the filing of the charges against Plaintiff.  Plaintiff filed an amended motion to bar the evidence for failure to comply with section 116–4 of the Code of Criminal Procedure of 1963.

On June 30, 2014, the trial court denied Plaintiff's motion to bar the State from using the fingerprint evidence.  The court ruled the vehicle was not forensic evidence. Instead, the fingerprints taken from the vehicle were the forensic evidence.  The court

---

[4]The parties did not include many facts about the destruction of Davieon Harper's car by Defendants.  However, it was covered by the Illinois Appellate Court in *People v. Harper*, 80 N.E.3d 856 (Ill. App. Ct. 2017), from which the facts in this section are taken.  Plaintiff has not argued or demonstrated that the facts surrounding the disposal of Davieon's car, as stated in the Illinois Appellate Court's decision, are erroneous.

noted that this evidence had been preserved and was available to Plaintiff. The court noted that Plaintiff had "not alleged that the vehicle in question contained any other specific evidence in or on the vehicle that was not already obtained that would exonerate the defendant." Further, the court found the fingerprints were not determinative to the outcome of the case and that Plaintiff did not allege the State or police did anything in bad faith. The appellate court affirmed the trial court on this ruling.

<u>Training and Discipline related to the Danville Defendants</u>

Each of the three Defendant officers (Bransford, Stark, and Campbell) had extensive police training, including from the Illinois Police Training Institute, and stayed up to date with continuing education requirements. Bransford in particular had experience with between 25 and 30 homicide investigations during his time as a Danville police officer, and said that because of the small department size, most detectives assisted on most such cases.

The DPD's training to become a detective consists of a two-year "rotator" program, where they are taught about the importance of eyewitness perception when it comes to identifying a suspect and factors that can affect their perceptions. This training is also taught in courses administered in the Illinois Police Training Institute as curriculum for both new officers and courses geared towards detectives. During this two-year rotator program, all detectives are required to take the Wicklander-Zulawski & Associates "5-Day Seminar for Lead Homicide Investigators" or a similar lead homicide investigator course.

The DPD Policy Manual, Section 8.6, provides the policy on the DPD's administration of discipline.  Any member that violates any statute, rule, regulation, order, instruction, policy, or procedure, is subject to corrective actions provided by this section which range in severity and may include verbal counseling, written reprimand, docking of pay, emergency suspension, suspension, and termination.

The DPD Policy Manual, Section 8.7, provides the policy on the DPD conducting formal investigations of complaints of officer misconduct, including violations of law, policies, procedures, rules, and regulations.  The investigations may be initiated by citizens, government officials, or internally by supervisors or employees.

ANALYSIS

Defendants argue that summary judgment should be granted in their favor because Plaintiff has not demonstrated the existence of a genuine issue of material fact with regard to any of his constitutional claims.  Defendants also argue that, even if he could make such a demonstration, they would be entitled to qualified immunity.  Defendants further argue that no genuine issue of material fact exists as to Plaintiff's Illinois malicious prosecution and intentional infliction of emotional distress claims.  As a result, Defendants contend, the remaining *Monell*, conspiracy, and indemnification and respondeat superior claims must fail as well.

*Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

21

In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  See *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture.  See *Singer*, 593 F.3d at 533.  In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920.  "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).  Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).  Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007),

citing *Celotex Corp.*, 477 U.S. at 322-23.

    *Count I- Violation of Due Process Due to Defendants' Fabrication of Evidence*

    Plaintiff contends that Defendants violated his rights to due process by fabricating evidence against him.  Defendants argue that there is no competent evidence in the record that they fabricated or manufactured evidence against Plaintiff.  Plaintiff, in his Response at pages 38 to 46, contends that Defendants "fabricated evidence and coerced witnesses in order to establish probable cause[,]" specifically: (1) between October 2009 and May 2010 Defendants coerced Smalley into falsely identifying Plaintiff as the shooter; (2) Defendants ignored Smalley's identification of other possible suspects and Smalley's underlying unreliability; (3) Defendants coerced Davieon Harper into testifying against Plaintiff, despite knowing he was an unreliable witness; and (4) Defendants coerced Logan Vance into testifying.

    Law enforcement officers may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, as doing so violates a defendant's right to a fair trial guaranteed by the Fourteenth Amendment's Due Process Clause.  *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 344 (7th Cir. 2019).  This is a high bar to clear, however, as a plaintiff must prove not only that the statement was false, but that the defendant officer "manufactured" it.  *Coleman*, 925 F.3d at 344.  That requires proof that a defendant caused a witness to provide him with a statement that the defendant officer knew — with certainty — was false.  *Coleman*, 925 F.3d at 344.  Evidence that merely impeaches an aspect of the witness' statement or suggests that the officer had reason to doubt the witness' statement is insufficient.  *Coleman*, 925 F.3d at 345.

23

The court should also note that Plaintiff's argument contains a lot of mixing of the terms "coercion" and "fabrication" with regard to the production of statements and testimony of the witnesses in this case, particularly Randall Smalley.  The Seventh Circuit has been careful to note that it draws a distinction, for due process claims, between a "coercion" case, for which there is no cognizable due process claim, and an "evidence fabrication" case, which is a cognizable claim.  See *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017).  Even if there were evidence of coercion, "coercion and fabrication are not synonyms," and the Seventh Circuit has "stressed that '[an allegation] that an officer coerced a witness to give incriminating evidence does not, at least standing alone, violate the wrongly convicted person's due-process rights.'" *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019), quoting *Avery*, 847 F.3d at 439.  Even more specifically, the Seventh Circuit has "drawn a line between coerced testimony—'testimony that a witness is forced by improper means to give ... [it] may be true or false'—and fabricated testimony—which is 'invariably false.'" *Anderson*, 932 F.3d at 510, quoting *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014).  "Only the latter supports a due process claim, and even then, only if the record shows that the officers 'created evidence they knew to be false.'" *Anderson*, 932 F.3d at 510, quoting *Avery*, 847 F.3d at 439.

Even though the constitutional bases for a pure coercion and evidence fabrication claim are distinct, they invariably overlap, as the *factual* bases ars often the same, or at least substantially coextensive.  See *Weston v. City of Chicago*, 2021 WL 2156459, at *6 (N.D. Ill. May 27, 2021).  Indeed, Plaintiff, in his Response, appears to intermingle

24

arguments that Smalley's statements were coerced as evidenced by Defendants improperly relying on an unreliable and un-credible witness, with arguments that Defendants deliberately pressured Smalley to produce statements Defendants knew were false. For the sake of reducing repetitive analysis, to the extent possible, the court, in addressing the evidence fabrication claims in this section of the Order, will analyze both whether there is a genuine issue of material fact concerning whether Defendants coerced witnesses and whether, even if there was coercion, that coercion amounted to Defendants' manufacturing evidence they knew to be wholly false.

Defendants' Alleged Coercion of Smalley Between October 2009 and May 2010 Into Identifying Plaintiff as the Shooter

Plaintiff points to a number of factors that he contends establish a genuine issue of material fact, when the inferences are drawn in his favor and the evidence is viewed in his favor, that Smalley's identification of Plaintiff as the shooter was coerced and fabricated. However, a review of all the facts in evidence reveals that there are no competent facts establishing that Smalley was in any way coerced by Defendants, beyond Plaintiff's own impermissible speculation and conjecture.

First, Plaintiff cites to Smalley's interactions with Defendants on the night of October 24, 2009. Plaintiff notes that Smalley spoke with an unidentified DPD officer at Elmwood Park the night of the shooting, but never said anything about identifying the shooter. This may be evidence of Smalley's reluctance or inability to identify the shooter at the time, in the immediate aftermath of the event, but does not provide evidence of any coercion on the part of Defendants. Further, Smalley's contacting of

25

Alblinger that night speaks to Smalley's prior interaction with Alblinger, and Smalley testified that Alblinger was someone he thought he could trust based on those prior interactions.  But there is nothing in the evidence of record hinting that at any point in this interaction, from the time Alblinger spoke to Smalley to the time Alblinger arrived at the police station with Smalley, Alblinger exerted pressure on Smalley to produce a statement Alblinger knew was false.

Plaintiff cites to the October 24, 2009, interview with Stark and Alblinger, where Smalley could not identify the shooter and gave a description of the shooter at odds with Plaintiff's appearance and Smalley's later descriptions of the shooter.  Again, however, there is no evidence that Defendants pressured or coerced Smalley at that interview, or engaged in misconduct in any way.

Plaintiff next cites the October 26, 2009, interview conducted by Stark as evidence of Defendants' coercive tactics, arguing that coercion is evident by the fact Defendants continued to interview Smalley even though they knew, after the October 24 interview, that Smalley could not see and/or identify the shooter.  However, such an inference is not a reasonable one, but rather pure speculation and conjecture.  Smalley was the main witness to a homicide that had occurred just two days prior.  It is perfectly reasonable for police to want to interview the main witness to a violent crime more than once, particularly after some time has elapsed in the immediate aftermath of the crime and to suss out any details the witness may have forgotten or overlooked.

Plaintiff also argues that the photograph of Plaintiff shown to Smalley on October 26, 2009, is evidence of impermissibly coercive tactics on Defendants' part

because Smalley failed to identify Plaintiff as the shooter at the October 26, 2009,

interview from that photo.  Plaintiff argues that "Defendants['] nefarious work finally

started to show its effects" seven months later when, on May 24, 2010, Smalley

contacted Defendants and told them he recognized Plaintiff as the shooter based on a

photo on the IDOC website.  Plaintiff argues that "Defendants knew, or at least should

have known, that showing a singular photo to a purported eyewitness is incredibly

suggestive."  In essence, Plaintiff's argument appears to be that Defendants knew

Smalley could not identify the shooter, and, wanting to frame Plaintiff, showed Smalley

one photo, Plaintiff's, at the October 26, 2009, lineup, hoping that Smalley would either

falsely identify Plaintiff as the shooter or a seed would be planted for Smalley to later

falsely identify Plaintiff as the shooter.

       This inference is not reasonable and, again, relies entirely on speculation and

conjecture.  There is no competent evidence, from any source, that any coercive tactics

were used on Smalley.  Plaintiff claims that the "singular" photo of Plaintiff to an

eyewitness is "incredibly suggestive."  However, that is not what happened in this case,

by Plaintiff's own admission.  Plaintiff's Additional Fact 31 indicates that his photo was

shown to Smalley on October 26, 2009, "from a photo-array[.]" Plaintiff's response to

Defendant officers' fact 22 (#61 at pp. 15-16) states that Smalley was shown "a photo-

line up by officers on October 26, 2009, which included a photo of Lafayette Harper but

did not identify him as the shooter."  The use of photo arrays by law enforcement to

identify suspects is permissible so long as the process used by law enforcement is not so

impermissibly suggestive as to give rise to a very substantial likelihood of irreparable

27

misidentification.  See *Lee v. Foster*, 750 F.3d 687, 691-92 (7th Cir. 2014).  Plaintiff has cited to no evidence that the use of a photo array on October 26, 2009, was impermissibly suggestive.  Indeed, Smalley's identification of Plaintiff seven months later came about as a result of *Smalley* contacting police on his own volition, not the other way around.

Smalley, at his deposition, at first said he might have heard of Plaintiff's name from his mother, then later corrected himself that he first heard of Plaintiff from Plaintiff's cousin Delonna Harper.  This contradiction might go to Smalley's credibility and reliability, but it is not evidence of any coercion or misconduct on the part of Defendants.  The undisputed facts are that Smalley himself contacted police seven months after the photo array, and only because Delonna Harper told him Plaintiff was the shooter, and Smalley looked at Plaintiff's photo on the IDOC website.  Smalley testified that, before that day, he did not know who Plaintiff was.  There is no indication in the record that any action by Defendants played any role in Smalley's identification of Plaintiff as the shooter.  In fact, even if the court assumes that the photo array more than half a year earlier influenced Smalley's subsequent identifications, none of that would be attributable to any misconduct by Defendants.  See *Coleman*, 925 F.3d at 348, citing *Perry v. New Hampshire*, 565 U.S. 228, 241 (2012) (holding the due process check on eyewitness identifications "comes into play only after the defendant establishes improper police conduct").

Plaintiff also cites to Defendants' failure to record some portions of the interviews with Smalley.  While "recording the entire interview preserves the integrity

of the evidence and minimizes the risk that erroneous (or coerced) eyewitness identifications go undetected[,]" and Defendants' procedure may have failed to do that on occasion, "such criticism of police methods does not by itself establish a constitutional violation." *Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015). On this record, there is simply no evidence of coercion or manipulation, and no evidence that Smalley said anything helpful to Plaintiff in those unrecorded interviews. See *Hart*, 798 F.3d at 588.

Plaintiff also argues as evidence of coercion and fabrication Defendants' failure to follow up on Mitchell Oaties, Jr. as a suspect. However, Plaintiff provides no evidence, outside of Shawna Miller's hearsay statements about Smalley telling her that Oaties, Jr., did the shooting and her speculation that Oaties, Jr. was the one contacting her on Yahoo Messenger, about Oaties, Jr.'s involvement and the nature and scope of the police inquiry into that involvement. Nothing about Defendants' inquiry into Oaties, Jr.'s involvement indicates Defendants fabricated evidence against Plaintiff.

Further, the cases cited by Plaintiff in support of Defendants using coercive tactics on Smalley are inopposite. In those cases, either the witnesses themselves, or a defendant who was subjected to the tactics, were claiming the police employed coercive measures on them to extract false statements. See *United States v. Vallar*, 635 F.3d 271, 282 (7th Cir. 2011) (the defendant claimed his confession was involuntary); *Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) (the allegedly coerced statements/confessions at issue were made by the plaintiffs in the case, who allege the statements/confessions were coerced). Here, Smalley is not claiming police coerced him in any way to identify Plaintiff as the

29

shooter.

Finally, much, if not all, of Plaintiff's argument against Defendants' on the issues of fabrication and coercion boils down to inferences that Defendants *must* have fabricated evidence based on Smalley's inconsistent statements about the shooter, Smalley's prior relationship with Alblinger, or failure to record or take notes on some of the interviews with Smalley, without providing the court any competent evidence from which such inferences can reasonably be drawn. Smalley himself repeatedly stated and testified that he was never coerced or pressured by Defendants or anyone else in any way to identify Plaintiff as the shooter. Plaintiff states, on page 45 of his Response, that Alblinger's question to Smalley on May 24, 2010, that "no one *outside of the police* has approached you and ... asked you or threatened you to make any type of statement ... on behalf of this investigation?" is "implicit" evidence that "Alblinger recognizes that the police had approached Smalley and in some way 'threatened' him to make an identification." (Emphasis from Plaintiff's Response). This interpretation of Alblinger's question is unreasonable and a logical leap far too far. Although Plaintiff is entitled to have all reasonable inferences drawn in his favor at summary judgment, inferences that are supported only by speculation and conjecture will not defeat a summary judgment motion. See *Coleman*, 925 F.3d at 345. Plaintiff is obligated to present evidence of Defendants' fabrication, as it is not Defendants' burden to disprove Plaintiff's hypotheses. See *Coleman*, 925 F.3d at 345, citing *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010) (noting it is a § 1983 plaintiff's burden to establish the underlying constitutional deprivation). Plaintiff has not done so here.

30

Plaintiff also argues that Smalley was "cajoled" into identifying Plaintiff as the shooter, citing to *Hurt* for the proposition that "the existence of coercion informs reliability even though it is not determinative." *Hurt*, 880 F.3d at 842. First, as noted above, this argument is misplaced in a Due Process Fourteenth Amendment fabrication claim, and is more properly made in Plaintiff's Fourth Amendment probable cause claim, where "the key inquiry for the Fourth Amendment remains reliability, not coercion." *Hurt*, 880 F.3d at 842.

Second, in terms of reliability, Smalley's credibility, particularly on identification of Plaintiff, was extensively cross-examined at trial. See *Harper*, 80 N.E.3d at 861. Plaintiff's arguments in the Response develop a solid cross-examination outline for Smalley's identification, "[b]ut such arguments do not establish a constitutional violation[,]" as "[a]fter all, 'the validity of an eyewitness identification is for the jury.'" *Coleman*, 925 F.3d at 349, quoting *Phillips v. Allen*, 668 F.3d 912, 916 (7th Cir. 2012). "Due process is not offended by the introduction of a questionable eyewitness identification; the jury may observe the witness, assess any alleged suggestive circumstances, and make its own determination about what weight, if any, to give it." *Coleman*, 925 F.3d at 349.

Next, Plaintiff contends that Davieon, despite being unreliable, was coerced into testifying against Plaintiff at the second trial. Plaintiff argues coercion is evidenced by Davieon being released early from prison shortly after Plaintiff's second trial. Plaintiff argues "[p]roviding such a reduced sentence in exchange for false testimony is nothing short of an unconstitutional promulgation of obviously false testimony in an effort to

deprive Plaintiff of his liberty."  First, there is no evidence in the record cited to by

Plaintiff that demonstrates any of the Defendants knew that the testimony provided by

Davieon implicating Plaintiff was false, as is necessary for a fabrication of evidence

claim.  See *Coleman*, 925 F.3d at 344.  Second, Plaintiff has cited to no evidence in the

record that any of the named Defendants participated in any way in procuring

Davieon's testimony at trial and in getting Davieon's sentence reduced in exchange for

said testimony.  Indeed, such actions are usually the work of prosecutors for the state's

attorney's office.  A § 1983 plaintiff must demonstrate a defendant's personal

responsibility for any claimed deprivation of a constitutional right, and Plaintiff cannot

do so with regard to Davieon's allegedly coerced testimony.  See *Miller v. Smith*, 220

F.3d 491, 495 (7th Cir. 2000).

Plaintiff next argues that Logan Vance was coerced into testifying against him,

citing the fact that this was Vance's first time being arrested, and the fact that Vance

worked "closely" with DPD officers at a jujitsu academy and had several officers as

clients at his barber shop.  Vance's work as a barber or jujitsu instructor is not evidence

that Defendants fabricated Vance's testimony against Plaintiff.  There is no evidence

any of the Defendants knew Vance from his work in that regard.  As to Vance's arrest, it

is not reasonable to infer that, because Vance had never been arrested before, he would

be more likely to fabricate a completely false statement implicating Plaintiff in Shutes'

murder.

Plaintiff also argues that Vance's statement to his girlfriend that he was "forced" to testify is indicative of coercion on the part of the officers. However, that statement does not indicate "who" forced Vance to testify, and thus does not implicate any named Defendant's personal responsibility for Plaintiff's allegation that Vance was coerced. See *Miller*, 220 F.3d at 495. Further, Vance testified at his deposition that he was never coerced, and that what he was referring to as being "forced" to testify was that he was subpoenaed. Even if the court were to find Vance was pressured in some way (there is no evidence as to which Defendant, if any, did the pressuring), there is no evidence in the record that Defendants knew Vance's statement was false, as is necessary to state a fabrication claim. See *Coleman*, 925 F.3d at 344.

The court finds that there is no evidence in the record demonstrating a genuine issue of material fact exists as to whether Defendants coerced Smalley, Davieon, or Vance in testifying against Plaintiff. Even if Plaintiff had produced evidence demonstrating a question of material fact as to coercion, he has not demonstrated evidence from which it can be inferred that any Defendant coerced witness testimony that the Defendant "knew to be false." See *Avery*, 847 F.3d at 439. Plaintiff's inferences are only supported by speculation or conjecture, see *Singer*, 593 F.3d at 533, and not the definite, competent evidence needed to survive summary judgment. See *Butts*, 387 F.3d at 924. Therefore, summary judgment must be granted in favor of all Defendants on Count I of Plaintiff's Amended Complaint.

*Count II- Violation of Due Process Due to Defendants' Failure to Disclose Exculpatory or Impeachment Evidence*

33

Plaintiff, at pages 48 to 50 of his Response, argues that Defendants committed a due process violation when they: (1) never disclosed their coercion of Smalley; and (2) destroyed Davieon's car, which was the scene of the murder and contained exculpatory evidence.

Plaintiff alleges a constitutional violation of due process for failure to turn over exculpatory/impeaching evidence to him as constitutionally required—a so-called *Brady* violation. *Brady v. Maryland*, 373 U.S. 83 (1963). "While most commonly viewed as a prosecutor's duty to disclose to the defense, the duty extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation." *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008). "A *Brady* violation can be broken down into three basic elements: (1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued — in other words, 'materiality.'" *Carvajal*, 542 F.3d at 566-67. Under *Brady*, "[e]vidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence; evidence is 'material' 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Carvajal*, 542 F.3d at 567, quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999).

First, summary judgment must be granted for Defendants on Plaintiff's *Brady* claims relating to Defendants' failure to disclose that they "coerced" Smalley, Vance, or Davieon into testifying against Plaintiff.  Because coerced testimony may in fact be true, the due process right to a fair trial is not implicated absent a violation of the *Brady* duty to disclose facts about the coercive tactics used to obtain it.  *Avery*, 847 F.3d at 439.  Armed with the *Brady* disclosure, the accused can impeach the coerced testimony by pointing to the tactics the officers used to extract it, and the jury has a fair opportunity to find the truth.  *Avery*, 847 F.3d at 439.  As found above, there is no genuine issue of material fact that Defendants coerced any witness in this case to testify against Plaintiff.  There is no evidence of coercion in the record.  The witnesses deny they were coerced in any way to testify against Plaintiff.

Nor has Plaintiff cited to any competent evidence that Defendant officers failed to turn over to the prosecution any exculpatory/impeaching evidence regarding how the witness statements and testimony were obtained.  See *Carvajal*, 542 F.3d at 566.  The entirety of Plaintiff's argument under *Brady* on coercion is "[a]s an initial matter, Defendant Officers never disclosed their coercion of Smalley."  There is no further elaboration.  This is not the definite, competent evidence Plaintiff needs to rebut Defendants' summary judgment arguments.

As noted above, any deal to reduce Davieon's custodial sentence would have needed to be arranged or approved by prosecuting authorities, and thus by definition would have been disclosed by Defendants to the prosecution, as required under *Brady*.  See *Carvajal*, 542 F.3d at 566.  Plaintiff has not sued the prosecutors nor alleged that the

prosecution withheld exculpatory/impeaching evidence from him.

The only other evidence that Plaintiff argues Defendants failed to disclose was their destruction of Davieon's car.[5]  Plaintiff argues that Defendants caused the car, the crime scene, to be destroyed, and that they performed a limited, cursory search of the car, but failed to secure it or preserve it for further analysis by Plaintiff for exculpatory evidence.  Plaintiff argues this destruction undoubtedly prejudiced his ability to mount a defense, and "[n]o amount of hand-waiving by the Defendants can establish that their destruction was somehow legitimate."  Plaintiff argues Defendants denied him the opportunity to search for additional exculpatory prints on the car, including his own in other locations on the car, and that his fingerprints were likely there, "because Plaintiff helped his cousin Davieon unload groceries that very same day."

Plaintiff further argues that, without the ability to examine the car, he cannot precisely point to what evidence he believes exists that will be exculpatory, but that, "[a]t the very least, it is very likely additional physical evidence - such as DNA evidence, hair strands, and/or clothing fibers" that existed in the vehicle would be

---

[5]Plaintiff makes no argument in this portion of his Response that Defendants failed to disclose evidence, apart from the coercion of witnesses and the destruction of Davieon's car.  Thus, the court will consider Plaintiff's *Brady* claim only as it relates to these two arguments. See *Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir. 1995) ("This argument is raised in a short conclusory paragraph which contains no substantive argument, legal citations, or references in the record. This court has no duty to research and construct legal arguments available to a party, especially when he is represented by counsel.") (internal quotations omitted); *Minemyer v. B-Roc Representatives, Inc.*, 695 F.Supp.2d 797, 809 (N.D. Ill. 2009) ("[T]his is an adversarial system. It is not a court's task to research legal arguments on a party's behalf."); *Polk v. Sears, Roebuck, and Co.*, 2012 WL 1640708, at *3 (S.D. Ala. May 8, 2012) ("It is well-established that courts cannot make a party's arguments for it or 'fill in the blanks' on that party's behalf.").

found and "that would have likely exonerated Plaintiff from being wrongfully accused of the shooting."  Plaintiff also notes that Defendants' examination of the vehicle "myopically focused on a limited area of the car[.]"

First, to the extent that Plaintiff is arguing this claim under *Brady*, it must fail. Plaintiff's supposition as to *what* exculpatory evidence would be found on Davieon's car is entirely theoretical, and to the extent that it is "exculpatory," it is only *theoretically* exculpatory, as in it "might" have helped Plaintiff, which does not satisfy the materiality standard under *Brady*.  See *United States v. Hamilton*, 107 F.3d 499, 509 (7th Cir. 1997), quoting *United States v. Agurs*, 427 U.S. 97, 109-10 (1976) ("The materiality standard is not met by '[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial....'").

Further, to the extent that Plaintiff is arguing Defendants had a duty to search and process the entire car for fingerprints, Defendants had no duty, under *Brady*, to process latent evidence in order to create exculpatory evidence for Plaintiff.  "Latent exculpatory evidence is evidence that requires processing or supplementation to be recognized as exculpatory[,]" such that the exculpatory character of the evidence is unknown and unknowable until the evidence itself is processed and the exculpatory nature of it becomes apparent.  *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011). The government is under no duty to direct a defendant to exculpatory evidence, of which it is unaware, within a larger mass of disclosed evidence.  *Gray*, 648 F.3d at 567. As noted by the Illinois Appellate Court, Davieon's car was not central or critical to the State's case; the fingerprints that were found on the vehicle were preserved and available to Plaintiff; Plaintiff had time to access the car before it was destroyed; and, while Plaintiff had filed a discovery motion before trial, he did not specifically ask the

State to preserve the vehicle.  *Harper*, 80 N.E.3d at 866.

Rather, Plaintiff's claim is more properly brought as a claim that the government failed to preserve *potentially* exculpatory evidence, pursuant to *Arizona v. Youngblood*, 488 U.S. 51 (1988).  See *United States v. Fletcher*, 634 F.3d 395, 407 (7th Cir. 2011). Plaintiff, in his Response at pages 48 to 50, makes no reference to or argument under the *Youngblood* analysis, and thus the court has no duty to make such an argument for him. See *Tyler*, 70 F.3d at 466.  Nevertheless, for the sake of completeness, the court will analyze Plaintiff's claim with respect to the destruction of Davieon's car under *Youngblood*.

In *Youngblood*, the U.S. Supreme Court held that the destruction of potentially exculpatory evidence is not a denial of due process of law unless it is done in bad faith. *Armstrong v. Daily*, 786 F.3d 529, 546 (7th Cir. 2015).  "A police officer's duty to preserve evidence applies when the officer either knows the evidence is exculpatory or destroys the evidence in bad faith."  *Hart*, 798 F.3d at 589; *White v. Fitzpatrick*, 755 Fed.Appx. 563, 570 (7th Cir. Nov. 26, 2018).  As explained above, there is no evidence of record indicating that Defendants knew Davieon's vehicle contained exculpatory evidence. Therefore, Plaintiff must demonstrate a genuine issue of material fact that Defendants acted in bad faith in disposing of Davieon's vehicle.  In this context, bad faith requires more than "carelessness" on the part of the government, but rather requires a conscious effort to suppress exculpatory evidence.  *Fletcher*, 634 F.3d at 408.

Plaintiff has put forward no evidence showing that Defendants' actions in disposing of Davieon's car amounted to bad faith.  First, there is no evidence that Defendants knew or suspected the car contained anything exculpatory, and thus destroyed it for that reason.  If anything, Plaintiff's arguments on pages 48 to 50 of the

Response only hint at the notion, or imply that the court should infer from the mere fact that the car was destroyed before trial that Defendants acted consciously to suppress exculpatory evidence. But such an inference is not supported by evidence from the record, and rather, relies on speculation and conjecture, improper at the summary judgment stage where competent evidence is required to rebut Defendants' factually-supported assertions.

The court's reasoning is bolstered by the facts as recounted in the Illinois Appellate Court opinion. Davieon's car was not destroyed until October 2011, two years after Shutes' murder, and almost *one year* after Plaintiff was charged with the murder. *Harper*, 80 N.E.3d at 859. Plaintiff has not argued, or provided any evidence, that he or his counsel were prevented from accessing the car for their own investigative or pretrial discovery purposes during that time frame. Indeed, in reference to Plaintiff's argument that the destruction of the car violated his December 2010 discovery request to disclose and produce objects the State intended to use at trial, the Illinois Appellate Court noted that Plaintiff had "not alleged the vehicle contained any specific evidence not already obtained that would exonerate him[,]" that "10 months passed between [Plaintiff's] discovery request and the scrapping of the vehicle[,]" and that it did "not appear [Plaintiff] made any effort to examine the vehicle during that period of time." *Harper*, 80 N.E.3d at 865.

The court's finding in this regard is informed by the Illinois Appellate Court's finding that Defendants did not act in bad faith. Although not binding on this court, the court finds the Illinois Appellate Court's analysis persuasive. In analyzing Plaintiff's argument under *Youngblood*, the appellate court compared Plaintiff's case to a different case where the Illinois Appellate Court found the police acted in bad faith based on the

quick destruction of material evidence, where the evidence was central to the defendant's misidentification defense, and the government used the testimony regarding the lost evidence in order to convict defendant. *Harper*, 80 N.E.3d at 865. By contrast, in Plaintiff's case, "the State did not rapidly dispose of the vehicle" and did "not try to use any evidence from the vehicle that had not been preserved[,]" a "far cry from the situation" in the other case, "where the State had destroyed evidence six weeks after the defendant's arrest and more than eight months before trial." *Harper*, 80 N.E.3d at 865.

In summing up why Plaintiff's arguments concerning the destruction of Davieon's car were unsuccessful, the Illinois Appellate Court found that the car itself was not central or critical to the State's case, and again noted that the fingerprints found on the vehicle were preserved and available to Plaintiff. *Harper*, 80 N.E.3d at 866. "Further, [Plaintiff] had time to access the vehicle before it was destroyed" and, "while [Plaintiff] filed a discovery motion before trial, he did not specifically ask the State to preserve the vehicle." *Harper*, 80 N.E.3d at 866. Finally, the court rejected Plaintiff's argument that, had he been able to inspect the car and collect physical and biological evidence he could have discredited the State's case and bolstered his own, with the court finding that Plaintiff failed to explain how he would have done this. The court also noted that the State did not find any evidence other than the fingerprints tying Plaintiff to the vehicle, and that, other than Shutes' DNA, no DNA was found inside the vehicle. *Harper*, 80 N.E.3d at 866.

Plaintiff has not demonstrated that a genuine issue of material fact exists as to whether Defendants' failure to preserve Davieon's car amounted to a willful effort to hide helpful evidence, and thus summary judgment must be granted in Defendants'

favor on Count II of Plaintiff's Amended Complaint.  See *Fletcher*, 634 F.3d at 408.

> *Count III - Unlawful Pretrial Detention Due to Lack of Probable Cause*

Count III of Plaintiff's Amended Complaint alleges that Defendants lacked probable cause for his arrest and pretrial detention and for his detention before his second trial following the Illinois Appellate Court's reversal of his conviction. Defendants argue that probable cause for Plaintiff's arrest and detention existed both before his first trial and before his second trial.

> Timeliness of Plaintiff's Claim

The parties dispute whether Plaintiff may timely make a claim for detention without probable cause as it relates to his initial arrest and detention before his first trial.  Plaintiff argues that that time should be counted in his unlawful detention claim. Defendants argue that the court may only consider the period of detention following the reversal of his conviction by the Illinois Appellate Court in 2017 and his acquittal at trial in 2019.  On April 17, 2020, this court entered an Order (#38), relying on the Seventh Circuit's unpublished order in *Knox v. Curtis*, 771 Fed.Appx. 656 (7th Cir. June 3, 2019), holding that Plaintiff's unlawful pretrial detention claim accrued in October 2014, when he was convicted at the first trial, and thus the statute of limitations on bringing that claim expired in October 2016, making it untimely in his 2019 lawsuit. However, Plaintiff's unlawful pretrial detention claim for the 2017-2019 period began to accrue when he was acquitted at the second trial in 2019, making that claim timely.

Plaintiff now argues that recent case law developments cast doubt on the Seventh Circuit's decision in *Knox*, and that *Knox* is no longer good law.  See *Smith v. City of Chicago*, 3 F.4th 332 (7th Cir. 2021).  Defendants argue that Plaintiff is mistaken in his interpretation of recent case law, and that the law of the case governs and the court

should not revisit its decision from the prior Order (#38).  However, for the reasons discussed below, the court need not determine the continued viability of *Knox*, because the court finds that Defendants had probable cause to arrest and detain Plaintiff both before the first trial and before the second trial.

<u>Whether Probable Cause Existed to Detain Plaintiff</u>

Plaintiff, in support of his argument that Defendants lacked probable cause to arrest him for Shutes' murder, argues that: (1) there exists no physical evidence tying Plaintiff to the murder; and (2) Smalley's (and Vance's and Davieon's) testimony against Plaintiff was the result of coercion and/or was so unreliable that it could not serve as the basis for probable cause.

To bring a claim for violation of the Fourth Amendment for unlawful detention, courts have set forth the following elements: the defendants (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor.  *Williams v. City of Chicago*, 315 F.Supp.3d 1060, 1070 (N.D. Ill. 2018).  "Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime."  *Abbott v. Sangamon County, Illinois*, 705 F.3d 706, 714 (7th Cir. 2013).  "[P]robable cause is not determined by retrospect.  It depends on what the police know, or reasonably believe at the time."  *Bridewell v. Eberle*, 730 F.3d 672, 675 (7th Cir. 2013).  "Probable cause requires only that a probability or a substantial chance of criminal activity exist[,]"and "[t]he evidence need not show that the officer's belief is more likely true than false." *Purvis v. Oest*, 614 F.3d 713, 722-23 (7th Cir. 2010).

Plaintiff in this case was arrested pursuant to a warrant, and a facially valid warrant generally shields an officer relying in good faith on the warrant from liability for false arrest. See *Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 483 n.5 (7th Cir. 2011). However, there is an exception to this rule, "namely that a facially valid warrant will pose no bar to a claim of false arrest when the officers responsible for effectuating the arrest knew that the warrant was issued without probable cause." *Williamson v. Curran*, 714 F.3d 432, 442 (7th Cir. 2013). Plaintiff invokes that exception here.

Turning to Plaintiff's physical evidence argument first, Plaintiff argues that no one single piece of physical evidence supports probable cause for his arrest on Shutes' murder. Plaintiff argues that his fingerprint on Davieon's car is of little value and is inconclusive at best because he helped Davieon put away groceries earlier in the day. But that is just Plaintiff's explanation for the presence of his fingerprint at the murder scene, and it was reasonable for officers to either doubt his explanation or believe that it also could have been left when Plaintiff robbed and murdered Shutes.

Plaintiff also argues that it was unreasonable for officers to rely on the phone calls between Plaintiff and Davieon in the moments leading up to and after the murder, because Smalley stated Davieon "was talking with someone who he doesn't know" and about meeting up with someone named "Moe." Plaintiff also claims that he only called Davieon afterward because he heard that his cousin had been involved in a shooting. Again, Plaintiff's arguments are unavailing. The standard is whether a reasonable officer at the time, viewing this evidence, could believe it constituted probable cause to arrest a person for a crime. Plaintiff's explanations and citation to Smalley's statements do not explain why Davieon called Plaintiff and spoke to him for more than a minute in the moments before the murder, and officers could reasonably rely on the evidence

from the phone calls to support their determination that they had probable cause to arrest Plaintiff for Shutes' murder. Plaintiff testified that he did not remember speaking to Davieon before the murder, but a "witness's inability to recall a fact cannot be used to create a genuine dispute about it; no recollection yields no competent evidence." *Rivera v. Guevara*, 319 F.Supp.2d 1004, 1044 (N.D. Ill. 2018) (citation omitted).

Plaintiff also argues that Defendants could not rely on Cunningham and Vance to tie Plaintiff to the murder, because officers never identified the type of shotgun shells that Plaintiff reportedly received from Vance, nor did they determine whether these shells matched the kind of shotgun shells used in the murder weapon. Plaintiff does not provide a citation to evidence in the record to support this point. Vance, in his deposition, did not remember the type of shotgun shells he received from Cunningham and provided to Plaintiff. Cunningham testified in his deposition, consistent with a police report dated November 10, 2010, attached as Exhibit 20 to Defendants' motion (#57-20), that he provided Vance with 12 gauge shotgun shells. Yet, nowhere in the parties' Statement of Facts or Additional Facts, was it stated what type of shotgun shells were used to kill Shutes. The suspected murder weapon was a shotgun recovered near the scene. The ISP crime lab did not detect Plaintiff's fingerprints or DNA on the shotgun. However, the ISP lab report dated February 15, 2010, attached as Plaintiff's Exhibit 3 (#61-3), identified the shotgun as an "Essex Gun Works, 12 gauge shotgun[.]" Defendants could reasonably rely on Vance's statements that he provided shotgun ammunition to Plaintiff in the days before the murder, which were carried out with a shotgun, to support their belief that Plaintiff committed the crime charged.

While each piece of physical evidence, by itself, would likely not provide enough to satisfy probable cause to arrest Plaintiff for Shutes' murder, when considered together the physical evidence provides a stronger picture of Plaintiff's possible involvement.  He was provided shotgun shells in the days before the murder, he was on the phone with Davieon in the moments before and after the murder, and his fingerprint was found on the passenger side back door that the shooter opened just before the struggle with and shooting of Shutes.  By itself, the physical evidence, even considered together, may not quite be enough for probable cause. However coupled with the testimony of Randall Smalley, Defendants certainly had enough probable cause to arrest Plaintiff.

Plaintiff argues that Smalley's identification of him as the shooter could not have been relied on by Defendants to establish probable cause because Defendants coerced him into making that identification.  As was explained in more detail above in the section on Count I of Plaintiff's Amended Complaint, Plaintiff has provided no competent evidence that Defendants coerced Smalley's identification of Plaintiff. Smalley himself testified he never felt pressured or coerced to identify Plaintiff, and the court has found that Defendants did not "cajole" Smalley or use coercive tactics to produce Smalley's identification of Plaintiff.  The photograph of Plaintiff shown to Smalley in the initial array was *seven months* before Smalley identified Plaintiff as the shooter based on his looking up Plaintiff's photo on the IDOC website.  It is an unreasonable inference that Defendants intentionally planted Plaintiff's photograph in the array, knowing Plaintiff was innocent, in order to "coerce" or "cajole" Smalley into making a false identification, and that it would bear fruit more than half a year later. Importantly, it was Smalley *himself* who contacted Defendants in May 2010, after

hearing from Delonna Harper that Plaintiff was the shooter, looking Plaintiff up on the IDOC website, and then having his "lightbulb moment."  Smalley even described to Defendants just how he had come to identify Plaintiff as the shooter.  Plaintiff has not produced any facts or evidence indicating Smalley's identification was the result of coercion.

Plaintiff also argues that Defendants knew they lacked probable cause to arrest him based on Smalley's identification because they knew that Smalley was unreliable, based on his failure to identify the shooter at the time of the shooting and the inconsistencies in his description of the shooter.  The Seventh Circuit has "consistently held that an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause."  *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000); see also *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006) ("Once a reasonably credible witness informs an officer that a suspect has committed a crime, the police have probable cause to arrest the suspect.").  Plaintiff argues that Defendants should have, objectively, known that Smalley was not credible because he could not identify the shooter on the night of the murder, he gave a description of the shooter that did not match Plaintiff, and because the lighting was poor and Smalley did not get a good look at the shooter, as he was in the front seat and Davieon had put him in a headlock.

However, since May 2010, Smalley has been consistent in identifying Plaintiff as the shooter and has not recanted his identification.  Smalley testified at his deposition in this case that he testified truthfully at all of Plaintiff's trials.  Smalley has admitted he only saw the bottom portion of Plaintiff's face.  Smalley was subjected to cross-examination at both trials about his inconsistencies and initial inability to identify the

shooter.  The Seventh Circuit has upheld probable cause for arrest when the only eyewitness has inconsistencies in their story, or even questionable motives.  See *Woods*, 234 F.3d at 997 ("We have found probable cause to arrest based upon uncorroborated citizen complaints which were far more questionable than was Flores' complaint. See *Spiegel*, 196 F.3d at 724–26 (finding that the defendant police officer had probable cause to arrest the plaintiff even though the victim had waited nearly a month to make a report, and even though there were inconsistencies in the victim's report as well as evidence suggesting that the victim's charge against the plaintiff was retaliatory); *Gerald M. v. J. Conneely*, 858 F.3d 378, 380–81 (7th Cir. 1988) (upholding district court's grant of summary judgment for police officer in a § 1983 case, reasoning that the uncorroborated complaint of a ten-year-old child that his bicycle had been stolen by two other children was sufficient to provide the officer with probable cause to arrest the accused children, even though the arresting officer knew of a long-standing grudge between the victim's family and the family of the accused children)").

The case cited by Plaintiff in support of his argument that Smalley was an unreliable witness, *Catledge v. McKnight*, 2016 WL 1933343 (N.D. Ill. Jan. 15, 2016), is distinguishable.  In that case, the district court found no probable cause existed for a warrantless arrest for stalking because the officers failed to establish, as a matter of law, that they had a reasonably credible eyewitness: the witness was a 911 caller, and the arresting officers only had a summary report of what the caller said, did not probe the caller's reliability or her basis for knowledge, had no prior experience with her, and did not question her about her allegations and basis for knowledge, corroborating only "innocent facts" about the suspect's appearance, location, and possession of a camera. *Catledge*, 2016 WL 1933343, at *7.

Here, Smalley, the main eyewitness to the murder, who was known to Defendants, came to Defendants seven months after the incident, convinced Plaintiff was the murderer, after being informed by Plaintiff's cousin that Plaintiff had pulled the trigger, and having confirmed it was Plaintiff by looking up Plaintiff's photograph on the IDOC website himself. "Where a reasonable person would have a sound reason to believe the suspect committed a crime, the police may arrest and allow the criminal justice system to determine guilt or innocence." *Coleman*, 925 F.3d at 351. Even assuming Defendants subjectively doubted Smalley's identification of Plaintiff, it was for the state trial court judge and jury to weigh Smalley's evidence. *Coleman,* 925 F.3d at 351. A police officer is permitted to rely on information provided by an eyewitness as long as the officer reasonably believes the witness is telling the truth, because "[i]n real-world investigations, police often confront the limits of human memory and facial recognition." *Hart*, 798 F.3d at 591. By way of example, "[a] witness who initially expresses doubt about being able to identify a suspect but then later tells police she recognizes a familiar face need not be considered mistaken or dishonest. Nor do minor inconsistencies among witnesses' statements necessarily imply that they are mistaken or dishonest." *Hart*, 798 F.3d at 591.

Smalley's identification, even if questionable, was enough to give Defendants probable cause to arrest Plaintiff. See *Coleman*, 925 F.3d at 351. It is true that Smalley initially could not identify Plaintiff as the shooter, and there were inconsistencies in his description; however, it is undisputed that Smalley identified Plaintiff as the shooter to Defendants in May 2010 and remained confident in his identification after that, consistently testifying to as much at both trials, which is sufficient to establish probable cause. See *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016) ("Plaintiffs have offered

evidence that Micetich expressed some hesitation during his initial identifications and that the identifications did not match his earlier descriptions very well. However, it is undisputed that Micetich did in fact identify Cairel and Johnson as the men who robbed him the night before and that Micetich remained confident in his identification after that. Micetich and Arias's eyewitness identifications were sufficient to establish probable cause.").

The arguments Plaintiff makes against probable cause go more to credibility issues that were appropriate for cross-examination at trial than to whether Defendants, acting in the position of a reasonable officer at the time with the information they had, reasonably believed that a probability or substantial chance of criminal activity existed with regard to Plaintiff's involvement in Shutes' murder.  See *Purvis*, 614 F.3d at 722-23.

Plaintiff argues that Smalley was unreliable and inconsistent in his initial statements and later statements.  While it is true that the second jury acquitted Plaintiff of Shutes' murder, the Seventh Circuit has noted that it "is worth emphasizing that there is a difference between evidence of the kind that negates proof beyond a reasonable doubt and that which is so significant as to undo the existence of probable cause." *Purvis*, 614 F.3d at 723.  Perhaps at the second trial the cross-examination of Smalley's inconsistencies was effective enough for the jury to acquit Plaintiff, but the evidence required to establish probable cause is considerably less than that required to sustain a criminal conviction.  See *Purvis*, 614 F.3d at 723.

Even construing Smalley's inconsistencies in the light most favorable to Plaintiff, as the court must do on summary judgment, in conjunction with the undisputed facts in the record it does not follow that Defendants lacked probable cause.  The inconsistencies and lack of Plaintiff's fingerprints or DNA on the shotgun certainly go

49

some way toward establishing a reasonable doubt as to Plaintiff's guilt, but Smalley's specific testimony, buttressed by considerable circumstantial evidence in the form of phone records, the fingerprint on the car door, and Cunningham and Vance's testimony about providing Plaintiff shotgun shells in the days before the murder, establish a substantial chance that criminal activity had occurred. See *Purvis*, 614 F.3d at 725. Plaintiff points to avenues he believes the investigation should have taken, or that Defendants should have had more skepticism of Smalley due to his unreliability, but the Seventh Circuit has long recognized that "'the law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage[,]'" because, "[u]ltimately, no investigation is perfect, but given the totality of the circumstances," the record makes clear that Defendants had probable cause to arrest Plaintiff, even when it is viewed in the best possible light for him. See *Purvis*, 614 F.3d at 725, quoting *Gerald M. v. Conneely*, 858 F.2d 378, 381 (7th Cir. 1988).

Defendants believed Smalley, and did not believe Plaintiff's denials of involvement in Shutes' murder. The existence of probable cause does not depend on the truth of a complaint of wrongdoing, and, "[s]o long as an officer reasonably believes the putative victim of or eyewitness to a crime is telling the truth, he may rely on the information provided to him by such persons in deciding to make an arrest, without having to conduct an independent investigation into their accounts." *Williamson*, 714 F.3d at 441. This is so even when, as here, the suspect denies an accusation of wrongdoing, because "[w]hen presented with a credible report of criminal behavior, an officer [is] under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth." *Williamson*, 714 F.3d at 441 (internal citations omitted).

50

In sum, the evidence available to Defendants at the time of Plaintiff's arrest included: (1) Smalley's eyewitness identification of Plaintiff as the shooter; (2) statements from Cunningham and Vance indicating Plaintiff had asked for and Vance had provided shotgun shells to Plaintiff in the days before the murder, which was committed with a shotgun; (3) that Plaintiff had been on the phone with Davieon Harper, who was in on the robbery with the shooter, in the moments immediately before and soon after the shooting; and (4) that Plaintiff's fingerprint was on Davieon's vehicle's rear passenger-side door, which had been opened by the shooter at the time of the robbery.  "Contrary to what its name might seem to suggest, probable cause 'demands even less than probability,'" but rather it "requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Woods*, 234 F.3d at 996, quoting *United States v. Moore*, 215 F.3d 681, 685 (7th Cir. 2000).  Based on this standard, the court finds Defendants had probable cause to arrest Plaintiff for Shutes' murder, and that this is certainly true for Plaintiff's detention between the reversal of his conviction and retrial, when, in addition, the State's case had the testimony of Davieon Harper identifying Plaintiff as the shooter.  Summary judgment is granted in favor of Defendants on Count III.

*Qualified Immunity*

Defendants have raised the defense of qualified immunity, which means Plaintiff must show two things: first, that there has been a violation of one or more of his federal constitutional rights, and second, that the constitutional standards at issue were clearly established at the time of the alleged violation.  *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016).  The court has found that, on the three constitutional claims, Plaintiff has not

shown that there has been a violation of one or more of his constitutional rights, and

therefore Defendants are entitled to qualified immunity on Counts I, II, and III.  See

*Taylor v. Ways*, 999 F.3d 478, 496 (7th Cir. 2021).

The court would further note that, regarding probable cause in Count III, based

on the facts of this case, even if Defendants in fact lacked probable cause to arrest

Plaintiff, a reasonable officer could have believed that probable cause existed, even if

that belief were ultimately mistaken.  See *Purvis*, 614 F.3d at 725.  A police officer faced

with the evidence unearthed by Defendants could not be characterized as "plainly

incompetent" in concluding that probable cause existed to arrest Plaintiff and, therefore,

even on this alternative ground, Defendants are entitled to qualified immunity.  See

*Purvis*, 614 F.3d at 725.

*Count V- Illinois State Law Malicious Prosecution*

In Count V, Plaintiff alleges that Defendants fabricated false evidence to initiate

and continue judicial proceedings against him maliciously, causing him to be deprived

of his liberty without probable cause.  Although Plaintiff's claim in Count III was

premised on violations of his federal constitutional rights under the Fourth

Amendment, and Count V is premised on a state claim for malicious prosecution, "the

existence of probable cause defeats both."  *Coleman*, 925 F.3d at 350.  The court has

already determined that Defendants had probable cause to arrest Plaintiff for the

murder of Shutes on Plaintiff's Fourth Amendment unlawful arrest/detention claim,

and, therefore, summary judgment is granted on in favor of Defendants on Plaintiff's

Illinois malicious prosecution claim.  *Hart*, 798 F.3d at 587-90; see also *Johnson v. Saville*,

575 F.3d 656, 664 (7th Cir. 2009).

*Count VI- Illinois State Intentional Infliction of Emotional Distress*

Plaintiff, in Count VI of the Amended Complaint, alleges that Defendant officers' actions against him were extreme and outrageous, rooted in an abuse of power and authority, and undertaken with intent to cause, or were reckless in disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff. "An intentional infliction of emotional distress claim under Illinois law requires proof of three elements: 'First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress.'" *Cairel*, 821 F.3d at 835, quoting *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003).

Plaintiff, at pages 50 to 51 of his Response, argues that Defendants' acts of fabricating police reports, coercing testimony out of an unreliable witness, and arresting Plaintiff were intentional and likely to cause severe emotional distress. However, the court has already found that no genuine issue of material fact exists as to whether Defendants fabricated police reports or coerced witnesses, so those arguments cannot for the basis for an intentional infliction of emotional distress claim. Additionally, the court has found that Defendants had probable cause to arrest and detain Plaintiff for Shutes' murder. The court has also granted summary judgment for Defendants on Plaintiff's Illinois malicious prosecution claim, which had as its basis essentially the same facts and arguments as undergird the intentional infliction of emotional distress claim. Plaintiff has not provided any competent evidence that Defendants' conduct in the course of the investigation of Plaintiff, his arrest, or prosecution went "beyond all bounds of decency [so as to] be considered intolerable in a civilized community." See

*Cairel*, 821 F.3d at 835.  Summary judgment is granted in favor of Defendants on

Plaintiff's intentional infliction of emotional distress claim.[6]

 *Count VII- State and Federal Conspiracy*

 In Count VII of the Amended Complaint, Plaintiff alleges both state and federal

conspiracy charges against Defendants.  Plaintiff alleges Defendants conspired to frame

him for Shutes' murder, in violation of his federal rights and in violation of the Illinois

torts of malicious prosecution and intentional infliction of emotional distress.

 "In Illinois, '[t]he elements of civil conspiracy are: (1) a combination of two or

more persons, (2) for the purpose of accomplishing by some concerted action either an

unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of

which one of the conspirators committed an overt tortious or unlawful act.'" *Gardunio v.*

*Town of Cicero*, 674 F.Supp.2d 976, 988 (N.D. Ill. 2009), quoting *Fritz v. Johnston*, 807

N.E.2d 461, 470 (Ill. 2004).  "It is well-settled that conspiracy, standing alone, is not a

separate and distinct tort in Illinois[,]" "[b]ecause it is the underlying tortious acts

performed pursuant to the agreement that give rise to a claim for civil conspiracy."

---

[6]Plaintiff's intentional infliction of emotional distress claim may also be untimely, because it would have begun to accrue at Plaintiff's arrest in 2010, or possibly his continuing detention in 2017 after the reversal of his conviction, and the one-year limitations period for filing such a claim would have expired in 2011, or, at the latest, 2018. See *Grayson v. City of Aurora*, 157 F.Supp.3d 725, 747 (N.D. Ill. 2016).  Plaintiff's intentional infliction of emotional distress may be timely to the extent it is premised on his malicious prosecution claim, because intentional infliction of emotional distress claims based on facts alleged in parallel claims for malicious prosecution accrue only when state criminal proceedings are terminated, and Plaintiff's criminal case did not conclude until 2019.  *La Playita Cicero, Inc. v. Town of Cicero, Illinois*, 175 F.Supp.3d 953, 970 (N.D. Ill. 2016).  However, as stated in the body of the Order, the court has already granted summary judgment in Defendants' favor on the malicious prosecution claim, and thus it cannot serve as a viable basis for the intentional infliction of emotional distress claim.

*Mauvais-Jarvis v. Wong*, 987 N.E.2d 864, 894 (Ill. App. Ct. 2013).  "[T]he conspiracy claim

fails if the independent cause of action underlying the conspiracy allegation fails."

*Coghlan v. Beck*, 984 N.E.2d 132, 151 (Ill. App. Ct. 2013).  Thus, because Plaintiff premises

his conspiracy claim on Defendants' conspiring to commit the tortious and unlawful

acts of malicious prosecution and intentional infliction of emotional distress (along with

the related constitutional claims), and those claims have failed, Plaintiff's Illinois

conspiracy claim predicated on those claims must also fail.  See *Coghlan*, 984 N.E.2d at

151.

     The same holds true for Plaintiff's federal conspiracy claim.  "To prevail on a

conspiracy claim, 'the plaintiff must show that (1) the individuals reached an agreement

to deprive him of his constitutional rights, and (2) overt acts in furtherance actually

deprived him of those rights.'"  *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018),

quoting *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).  Put differently, a

plaintiff must show an underlying constitutional violation and demonstrate that the

defendants agreed to inflict the constitutional harm.  *Daugherty*, 906 F.3d at 612.

Because Plaintiff has failed to present evidence supporting an underlying constitutional

violation, Defendants are entitled to summary judgment on his § 1983 conspiracy claim

as well.  See *Coleman*, 925 F.3d at 351.

     Because the court has already granted summary judgment on all the underlying

federal constitutional and Illinois tort claims on which Plaintiff's conspiracy claims are

premised, summary judgment is granted in Defendants' favor on the Count VII Illinois

and federal conspiracy claims.

*Count IV- Monell Claims*

Based on Plaintiff's Amended Complaint, he seeks only monetary damages in the form of compensatory and punitive damages for all of his claims, including his *Monell* claims in Count IV.  Nowhere in his Amended Complaint or Response does he indicate otherwise.  "If a § 1983 plaintiff seeks only monetary relief, and if a municipal defendant is willing (or required) to indemnify individual defendants for compensatory damages as well as an award of attorney's fees and costs, a *Monell* claim against the municipality will offer a prevailing plaintiff no additional remedy (aside, perhaps, from nominal damages)."  *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015).  The Seventh Circuit has held that "[i]n such cases there is no need for the parties to spend time and money litigating a *Monell* claim[,]" and "[i]f the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations."  *Swanigan*, 775 F.3d at 962; see also *Gibson v. City of Chicago*, 2021 WL 2127182, at *1 (N.D. Ill. Apr. 6, 2021).

The court has held that Plaintiff has failed to demonstrate that a genuine question of material fact exists as to Plaintiff's constitutional claims against the individual Defendants, and thus his *Monell* claim, which is explicitly tied to the individual due process and Fourth Amendment constitutional claims and for which Plaintiff seeks no additional remedy, is not viable.  See *Swanigan*, 775 F.3d at 962.  Summary judgment is thus granted for Defendant City on Plaintiff's *Monell* claim.[7]

---

[7]Even if Plaintiff had made a request for something other than monetary relief, judgment would still have to be granted in Defendants' favor on the *Monell* claim because the court has already found that he has suffered no underlying constitutional injury, and thus Plaintiff has no basis to support a *Monell* claim.  See *Petty v. City of Chicago*, 754 F.3d 416, 424-25 (7th Cir. 2014) ("if no constitutional violation occurred in the first place, a *Monell* claim cannot be supported[,]" and since the plaintiff's due

*Counts VIII and IX- Respondeat Superior and Indemnification*

Plaintiff's respondeat superior and indemnification claims are derivative of the underlying state law tort claims, and as a result are entirely dependent on the success of those primary claims against Defendants, because one cannot have vicarious liability without primary liability.  See *Taylor v. City of Chicago*, 2003 WL 22282386, at *7 (N.D. Ill. Sept. 30, 2003).  Having found that Plaintiff's primary claims against Defendants cannot withstand summary judgment, the court must also grant summary judgment on Plaintiff's claims against the City for respondeat superior liability and indemnification, and, accordingly, summary judgment is granted on Counts VIII and IX of the Amended Complaint.  See *Taylor*, 2003 WL 22282386, at *7; see also *Saunders v. City of Chicago*, 2013 WL 6009933, at *13 (N.D. Ill. Nov. 13, 2013).

IT IS THEREFORE ORDERED:

(1)     Defendants' Motions for Summary Judgment (#49), (#57) are GRANTED in full.  Judgment is GRANTED in favor of ALL Defendants and against Plaintiff on ALL counts of Plaintiff's Amended Complaint.

(2)     The final pretrial date of April 4, 2022, and jury trial date of April 19, 2022, are hereby VACATED.

(3)     This case is terminated.

ENTERED this 7th  day of February, 2022.

s/ COLIN S. BRUCE
U.S. DISTRICT  JUDGE

---

process rights were not violated by the police officers' allegedly coercive tactics, "he cannot prevail on his *Monell* claim and the district court properly dismissed his claim.").